Now on is this case on the job of Witcher 2-E3-0-0-3-3 Witcher Consultants' Community Secret Contacts Alliance Consultants, the Alliance Clinical Associates, SC and Generations Family Medicine, Defendant's Acquaintance Partner on behalf of the Defendant's Acquaintance, Ms. Linda Sue Cagan Partner on behalf of the Defendant's Acquaintance, Generations Family Medicine, Ms. Jacqueline Fast-Water Partner on behalf of the Defendant's Acquaintance, Alliance Clinical Associates, Mr. Robert L. Larson Both appellees have requested time to argue. Is there any objection to both appellees? The briefs I noticed are identical, but you have additional comments to make? For the most part, there are a couple of differences. Very well. If all may proceed. Good morning, Your Honors. I'm Linda Cagan on behalf of the appellants, Richard and Julie Ainslie. Good morning, Mr. Larson, Ms. Weiler. Nothing Compares to You was a big hit in the late 1980s, early 1990s, sung by an Irish singer-songwriter named Sinead O'Connor. And by changing one word of the title to Nothing Compares to This, I think I've summed up the two issues in this appeal, which I'd like to discuss this morning. The first issue is whether the initial complaint was time-barred because of a mistake in the trial lawyer's attorney code number, which caused the clerk's office to reject the otherwise timely filed complaint. The attorney code number was corrected, and the initial complaint was refiled on January 11, 19 days beyond December 24, 2016, which was the expiration of the statute of limitations. There is no dispute that December 24 is the operative statute of limitations date. If the court holds that the complaint was not timely filed, then there's no jurisdiction at any level, and the court doesn't even reach the second issue in this appeal, which is whether the second amended complaint stated a cause of action for intentional infliction of emotional distress when a disabled person's treaters, namely a therapist and a medical provider, failed to inform her legal guardians that she was pregnant, wanted to have an abortion, and had one without her guardian's knowledge, input, or consent. Now, the intentional infliction of emotional distress, you have to show that the conduct was so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. That is the legal standard. So abortions, whether you like it or not, are legal. Correct. In this state. So how is this conduct, that of an abortion, so outrageous and beyond the bounds of decency? I mean, I see that as your stumbling block. How do you get by that? Well, I don't think this case is really about abortion. I think it was about the process of the treaters having been on notice that their patient was a disabled person and that medical decisions about the disabled person should have been made in conjunction with her legal guardians. So whether it was an abortion or a blood transfusion or sterilization, it was the process that was sideswiped here. So the medical decision. Excuse me. Under what legal authority, though, do you find that there was an affirmative duty on the defendants to disclose Kylie's medical records as opposed to responding to a request, which is what the statute requires, the Illinois medical disclosure and confidentiality? I've been candid in my briefs that there was no case in Illinois, there's no statute, which explicitly would have required either defendant to disclose explicitly. But what they should have done, since they knew that their patient was disabled, is they should have known that any kind of medical treatment or advice of such a momentous nature should have been disclosed. I realize that whether a duty exists is a question of law. Well, what really, with respect to an intentional tort, what role or what relevance is duty? Well, if there's no duty, there's no tort. Well, for an intentional infliction of emotional distress, ordinarily, the conduct and the person who's present, and here you're talking about third parties that are injured, right? Correct. Not Kylie? Not Kylie, the parents slash guardians. Do you have a case where the injurious conduct does not occur in the presence of a third party? Is there a case anywhere? Here the conduct was the counseling, correct, the election? The counseling and then the fact that the generations gave her the pregnancy test and she tested positive and then the generations did not disclose to the guardians that their ward was pregnant. And none of that activity took place in front of the parents? That particular activity did not, but there was other activity, particularly in the case of Alliance, where there were counseling sessions with the counselor and the guardians and the patient and also solo sessions with the ward. So there was family therapy and then there was individual therapy. And one of the arguments I've made is that there was some written communication from Alliance that's alleged in the complaint which refers to... Your clients brought this case as guardians, correct? That's right. But the only injury that's alleged is injuries that they suffered, not Kylie. So how can we allow that? They didn't bring it as guardians. They didn't bring this case as guardians. It's not captioned in that way, but the complaint certainly refers to their status as guardians. But they're seeking to recover as individuals, not as guardians. I don't know if that's entirely clear, Your Honor. I think it's your job to make that clear in your pleadings, isn't it? Well, it may have been the trial lawyer's job to make that clear. I'm making my arguments based on this complaint as it was found. And I think that when Alliance stated in a writing that it's imperative that any interventions with Kylie and her family be well coordinated and there should be regular, open, and clear communications between Kylie's clinical providers and her family in order to assure that stressors and symptoms are being adequately identified, monitored, and addressed, that that... Stressors for who? Stressors for... Well, it's somewhat vague, but it could be stressors for Kylie, clearly, but also stressors for the family. They were all being seen by Alliance. And I've argued that that language, which came from something that Alliance provided, is quoted language. I don't know the source of it. I mean, this complaint was tossed at the pleading stage. There's been no discovery. But that language supports the notion that Alliance voluntarily undertook a duty to disclose what was going on with their patient. Well, how do we find, from an agreement to openly communicate, a voluntary undertaking to disclose all that occurred in treatment? How do you... Well, being open doesn't necessarily mean the same thing as voluntarily undertaking to disclose everything that went on in treatment. I can imagine a situation where Kylie would say something in confidence to her therapist and then the therapist would, in some fashion, relay, there's some serious stuff going on with your daughter. They don't necessarily have to disclose the substance, but I think they had a duty to let the guardians know that there was a situation here. You say in your brief that the determination of whether or not conduct is extreme or outrageous is openly subjective. I did say that. Is there any authority for that? And how does that square with what the court said in Gregg, where the court said the conduct is actionable, whether conduct is actionable is made pursuant to an objective standard, not a subjective standard? Well, I believe that ultimately, because judges are human beings, anything that is, quote, unquote, objective is really ultimately subjective because there is no bright-line test for what kind of conduct is outrageous. What's outrageous to one person may not be outrageous to another person, and clearly this was not conduct that was outrageous enough to the trial court judge. Well, speaking of the trial court, the trial court noted that there was no allegation anywhere in the complaint or in the affidavits that the plaintiffs made the defendants aware of their strong personal beliefs about abortion. Correct? That's correct. So how would a lot of generations have known that counseling Kylie to get an abortion would have been horrible in their eyes? How would they know that? They wouldn't have known that, but I don't think that's the point. I think that any kind of momentous procedure, such as abortion, sterilization, a blood transfusion, I mean, this young woman was not being treated for a hangnail. I mean, she was deemed to be a disabled person, and her legal guardians were in charge of her medical decisions. But we're talking about a legal procedure. That's true. And it's legal in every state, correct? That's correct. And there was nothing illegal about Kylie being advised about the pros and cons of getting an abortion, correct? I agree with you. And there's no allegation. Conduct could be deemed outrageous if the defendants knew that the plaintiffs were particularly susceptible to being upset about this, but they did not know that, did they? Well, they didn't know. I agree with you, Your Honor. They did not know that these plaintiffs were going to be susceptible to the abortion issue. But my argument is a little broader than that. Well, let's stick to what the law requires. The law requires that the defendants knew or should have known that, I mean, especially with respect to a legal procedure, that this would have had a devastating effect on them. And aside from the fact that they were not present for the alleged harmful conduct, how do you get around that? It's not easy. That's why they repealed. Look, I think ultimately I think there has to be some kind of a value judgment made that if treaters who are on notice that their patient is a disabled person and is seeking some kind of treatment, whether it's legal or illegal, and clearly an abortion is legal, the treaters still have a duty because the patient is disabled to inform the guardians. There's no question about that. But there are other avenues that you could have gone other than a personal injury suit, if you will, seeking damages for the effects that this may have had on them. If your main concern is sending a message to physicians or treaters that you can't make a decision when you have a disabled person there, you have to consult their guardians, I agree with you. There are other measures and other ways you can go. But you have to prove that the conduct was so outrageous here that it caused damages to your clients. And you rely on CRAGG, which is the facts are so easily distinguishable in that case because the plaintiffs were present when this behavior occurred to them. In this case, it's almost like a transferred intent, if you will, to your clients. So maybe, yes, you're trying to send a message to physicians, but you're also trying to get personal injury dollars, and you have to be able to comply with the rules that require you to get those damages. So I understand what you're saying. You're saying two different things. You're saying, oh, we've got to send a message. But you don't have to send a message by saying we were injured as a result, because if you're injured as a result, you better show some outrageous conduct, and you better be in a zone of danger, if you will, when this conduct has taken place. I don't see it. And so how do we get around this when we are on the appellate court? We're really to follow the law. We're not writing the law. Well, you certainly have the authority, because you have the power of de novo review, to look at this complaint and see if it adequately pled the elements that fit into this category of intentional infliction of emotional distress. That's exactly right. So tell us how it fits in that category. Defendant's conduct is extreme and outrageous, and each defendant, by providing the counseling to Caylee. It was conduct of covert conduct. There was no way that the plaintiffs could have known because they weren't present. How did that cause the injuries to your client? It was after they had the knowledge, after they received the knowledge that they had not been informed, they were damaged emotionally because they alleged that the defendants intentionally withheld that knowledge from them. Now, you have a few more minutes. Caylee disclosed to the plaintiffs that she had an abortion. Yes. It was Caylee's conduct that caused the alarm, the harm, the emotional distress for her conduct. So in other words, had Caylee not disclosed to her parents that she had gotten pregnant and had an abortion, there would be no injury, correct? True. You also concede that to be actionable, the conduct must be so extreme in degree as to go beyond all possible bounds of decency. And there aren't any cases, and I've been candid with the court, which support this particular fact pattern. And you're asking us to measure the bounds of decency by a subjective standard as opposed to an objective standard, correct? Because ultimately the bounds of decency are decided by human beings. Individuals. Individuals. Well, how would that kind of jurisprudence measure up to the standards that we have, that you could bring a cause of action for conduct that otherwise would not be harmful to some other individual, but because of my own particular beliefs, I'm harmed by it. How would that work? Well, it depends on the case. I don't have one. All right. It really doesn't matter. I have a question. Are I finished with the e-filing issue? Do you want me to address that? No. Okay. And one other question. You said, well, I found no cases. How about Diamond? Diamond? Diamond versus Nyquist. Oh, Diamond. Diamond versus Nyquist. That was the unauthorized psychiatric treatment of the minor? Right. Well, the unauthorized psychiatric treatment of the minor did not occur in the presence of the father. He didn't complain. It didn't. He found out about it. Now, his claim for intentional affliction was dismissed, but he had other claims that survived. Well, in this case, similar to Dymick, I mean, here, Kylie is the one that stands in a similar position as the child in the Dymick case, doesn't she? Yes. I would agree with you, Your Honor. Have you looked at Riley versus Wyeth? Riley versus Wyeth. That was a case involving an allegation of intentional affliction of emotional distress where the mother sued the vaccine makers for putting in for a component in the vaccine that led to the child becoming autistic? No, I'm not familiar with that case. No. Thank you. Do you have additional questions? Oh, you'll have time for your vote. All right. Thank you. Good morning, Your Honors. May it please the court, counsel, Katherine Weiler on behalf of Generations Family Medicine. Mr. Larson will be arguing after me on behalf of Alliance. The court's questions highlight the fundamental problem in this case, and that is what exactly is the alleged outrageous and extreme conduct at issue here? Plaintiff's counsel gave the court more than one answer to essentially that question. Initially, and this is in the papers, the alleged outrageous conduct is, quote, the failure to inform the legal guardians of their ward's pregnancy. That's one. But there are other times when there is an allegation that the guardians had a duty. As Ms. Kagan just said, there was something going on with Kylie, and there was some amorphous obligation to suggest to the guardians maybe that there was something going on. If the allegation here is simply the failure to advise the Ainsleys of their adult daughter's pregnancy, there is no claim for intentional affliction of emotional distress. And it's for all of the reasons that each of you has pointed out over the course of this argument. None of the elements of a claim for intentional affliction of emotional distress is properly alleged here. None of them. Is there a cause of action other than intentional affliction of emotional distress for the physicians or whomever, failure to follow through with the guardians when they're counseling a disabled adult? Let me answer the question, but it's a multi-part answer, Your Honor. There's not one alleged here. So is that before the court? No. Is there potentially a claim? I can't answer that question. I'm not sure of the answer to that. But fundamentally, what we all need to keep in mind is that this is not a case about Kylie's abortion. And that is a crucial point to keep in mind. This is not a situation where any of the defendants were responsible for the care and medical treatment that resulted in Kylie's termination. She did not go to Generations Medicine for an abortion. She did not seek out pregnancy termination care from any of these defendants. What is at issue here is the fact that Kylie was given a pregnancy test, she was told she was pregnant, and she was given her options. One is pregnant. What are one's options? You can keep the baby. There's the possibility of abortion. There's the possibility of adoption. Those are your options when you're pregnant. That's the issue here. It's not that an abortion was provided by one of these entities. And that's important, Justice Shostak, to something that you mentioned. You were asking about the obligations of one of these providers in exactly the situation you're describing right now. Would there be another claim? Did the abortion provider have an obligation to inform the parents? Potentially. And there is a statute, the Parental Notification of Abortion Act. But even the Parental Notification of Abortion Act includes a provision that allows the waiver of the notice provision in certain situations for a minor or for an adult disabled person. This is, if the court wants to look at it, I know, Justice Shostak, you're nodding, you've seen it. But it's 750 ILCS 70-25, subparagraph D. If the minor or incompetent person is sufficiently mature and well enough informed to decide intelligently whether to have an abortion, then the notice provision is waived. Well, who makes that decision? In this case. Excuse me. Go ahead. The court can make that decision. The minor or the disabled person has the ability to petition for that decision. But the reason that's important in this case, and Justice, if you're asking a question, I don't want to interrupt. If the minor or incompetent person wants to make that decision and goes to the court and the trial court would make the determination, yes, the minor or incompetent person satisfies this standard. Based on the plaintiff's argument in this case, could the parents of that minor or disabled person sue the trial court for intentional infliction of emotional distress? It's the same claim. It would be failure to inform the parents or guardians of a pregnancy. Certainly, that's not a viable claim. I think we could all agree on that. But in this case, that's exactly what the plaintiffs are arguing. We were not informed about a minor daughter's pregnancy. And so we have an intentional infliction of emotional distress claim. That's simply not viable under the law. One of the questions, Justice Burkett, you were asking about is related to this standing and duty concept. I realize it's a little bit difficult to articulate because you're correct, Your Honor, there is no duty requirement for an intentional tort. This is not alleged as a negligent tort. But there certainly is a threshold question about whether there is some sort of a duty or whether these parents have a standing. And standing to bring this claim. And as you pointed out, Justice Shostak, these claims are brought on behalf of the parents. These claims are not brought by the parents as the legal guardians of this disabled adult. And I checked the second amended complaint. I apologize to the court. I don't have the record site in front of me. But I believe it's on page 6 of the second amended complaint. If the court reviews exactly what the damages sought are, they're being sought on behalf of the parents individually. What is the alleged outrageous conduct against these individual parents, or excuse me, against these individual defendants? What did these individual defendants do to the parents that was so extreme and outrageous? Well, they knew, so what counsel is arguing is they knew that they were dealing with a disabled adult. A person who the Circuit Court of Will County found totally without understanding or capacity to make or communicate decisions regarding her person. Now, wouldn't that fall within the category of information, knowing that there should be open communication or that open communication was expected by the guardians? Wouldn't that be information, the fact that she was pregnant and had to make a decision about her person? Why wouldn't that fall within the category of information that should have been disclosed given these particular facts and the fact that the Circuit Court had found her to be, as I said, totally unable to make decisions regarding her own person? She was able to communicate her wishes, first of all, just to be clear about the scope of the guardianship order. I understand the court's question, but to be clear, this isn't a situation where the disabled adult was unable to communicate, for example. That would potentially be a different situation. That's not what we have here. However, two additional points in response to your question, Your Honor. First of all, to the extent that there is some sort of a discussion about an agreement between the parties to communicate, that would go to alliance. That's related to allegations on the counseling, and I would defer on that to Mr. Larson. There is no such allegations related to Generations. The other point, though, that's important to hear is, again, we aren't talking about a requirement that Generations disclose the health condition of this young woman to her parents. Is there a requirement of any sort of disclosure by potentially an abortion services provider? Perhaps. I can't answer that question. There may be. That's not the claim against Generations, though, and that's the crucial distinction here. If that were the claim, we would be discussing a different issue. It's not. Kylie had a pregnancy test at Generations. It came back positive. She was told of her alternatives for moving forward, and that was the end of Generations' involvement under the allegations in the current leap in the Second Amendment complaint. There are no other allegations. In your Second Amendment complaint, you don't, in your argument or in your brief, you don't address the averments that are in the affidavits. Because, frankly, Your Honor, they're not relevant to articulating the requirements for stating a claim. Any of these, this threshold requirement of outstanding or the three elements that must be alleged to articulate a prima facie claim for intentional infliction of emotional distress, the affidavits don't move the ball forward at all on that. An easily, I think, quantifiable point is the discussion we had earlier about the intended conduct was the conduct intended to inflict severe emotional distress. Plaintiff's counsel conceded today during argument, and there is no allegation in the Second Amendment complaint, as you pointed out, that Generations had any idea that discussing abortion services with this patient would be in any way offensive to the parents. There was no allegation that Generations understood, excuse me, the parents' opposition to abortion or their religious principles. In that situation, how is Generations responsible for any intention to cause extreme emotional distress? Or even, the bar is a high one. They should have known that there was a high probability that simply mentioning the word abortion to this patient could cause severe emotional distress to the parents. Again, this is not to the patient. This is to the parents. There is no allegation that satisfies that standard. That is a fundamental failing in the complaint. That of itself justifies the circuit court's decision to dismiss the entire complaint, because at that point, there is no pre-mutation case properly alleged. It's kind of similar to Craig, where the damages or the, they weren't considering the unconsented medical decision. They considered the ramifications that the berating had upon the daughter. Exactly. That's correct, Your Honor, directly to the daughter and the wife. And without that conduct directed to the individuals bringing the case, there really isn't a standing. If the court has no further questions, for all the reasons we've addressed, we'd ask the court to affirm the circuit court's ruling. Mr. Lawson. May it please the court. Counsel, I will, of necessity, be brief. As we did at the pleading stage, I will adopt the arguments of the co-defendant. I think the court has addressed many of the points that I would otherwise make. I do think it's important to frame the argument before this court to consider a quote from plaintiff's own response brief. The Mental Health Act permits disclosure when, and to the extent a therapist, in his or her sole discretion, determines that disclosure is necessary. This is interesting and a unique relationship. The relationship of patient and therapist is one that is highly protected under the law. At most, in this case, plaintiff could argue that the therapist made a bad judgment call in not disclosing information in a circumstance where the family agreed to have certain conversations where they were present and certain conversations where Kylie was alone with her therapist, and whether or not to disclose information learned in those private conversations. That's a tough judgment call, given the standards in the Mental Health Act on whether or not to do that. How does that change when you have a disabled adult? I don't think it does. In fact, that language addresses the specific issue of when disclosure can be made. We've cited the fact that the plaintiff cited the portion of the Mental Health Act that allows the family to request the records when they are the guardians of an adult. They did not make that request. And again, the comments were not directed to the family but to Kylie. And even if one were to determine that was negligent on their part not to decide to disclose that information to the family, that comes nowhere near the sort of outrageous conduct that would necessitate an intentional infliction of emotional distress claim, as we have here. Many of the facts are undisputed. The relationship between the Eislings and the Lyons was established for Kylie's benefit, not the family's benefit. That's what the relationship existed for. The plaintiff's counsel indicated that, well, the family was there. Well, the family wasn't there to talk about their issues. The family was there to talk about Kylie's issues. That's what the counseling was for. And so they made the decision in consultation with their therapist, we will talk as a family and then you can talk to her individually. Well, didn't some of their issues come out in that counseling? I mean, the counselors knew the family probably pretty well from counseling, correct? I imagine there was some discussion of the focus of Kylie's issues. There's nothing in the complaint that alleges there was a discussion of any issues involving Ms. Siebert-Eisling or the husband in terms of their own mental health or their own religious beliefs. There's nothing alleged in that regard. The focus of this relationship was Kylie, as was, I think Your Honor mentioned the issue of the consent order or the guardianship order. That guardianship order exists for the benefit of Kylie, not for the benefit of her parents. So, again, Kylie is not a part of this case. But, I mean, her parents are the guardians. So, I mean, it's their obligation to act on her behalf, correct? It is. And if they were ringing this complaint on her behalf for an argument that somehow she was improperly advised, then there might be a very different issue. That's not the case before this court. Neither Alliance nor Generations performed the abortion. That's not an issue. They are not the providers. And it was Kylie who told the family on Christmas Eve. Not any member of Alliance or Generations who told the family. And that is the specifically alleged act that caused them emotional distress. Not any communication that took place before. Would you agree that conduct may be deemed outrageous if the defendant knew or should have known that the plaintiffs were particularly susceptible to being upset or emotionally traumatized by news that their client had an abortion? I think, Your Honor, that can be taken into consideration. It is not the end of the answer. And I think plaintiffs have cited a case which, frankly, was cited for the first time in their reply brief. And that argument was made for the first time in their reply brief. Not even at the trial court level. But I do think that. Which case in the back? That is the, I have the. Dynick? No, Your Honor. It was another, one of the last pages of their reply brief. It was on page 15, I believe, they cited to the case of Public Finance Corporation v. Davis. Knowledge that another is peculiarly susceptible to emotional distress may make a person's conduct actionable when it otherwise would not be. But I would point out that court also said you still must establish outrageous conduct. The mere fact that somebody is somewhat more susceptible in and of itself does not make the conduct outrageous. The reason, Your Honor, I point it out, because if that were the standard and plaintiffs had made this eggshell-thin-skull plaintiff argument, then theoretically anybody who could claim offense at something someone said or did could file an intentional and sufficient emotional distress claim. And I think the history of Illinois jurisprudence has shown the desire to put a limit on this type of a cause of action. Thank you. Thank you, Your Honor. Thank you. Thank you. Given the fact that Generations also treated Julie, the co-guardian, for her medical illness, multiple sclerosis, I did make the argument that it was certainly reasonable for the judge to have inferred, which he did not, because he didn't even reach this issue, that particularly with respect to Julie, her multiple sclerosis could have been exacerbated by this chain of events. You know, any time a person, whether it's a minor or an adult that you care about, has an emotional distress, you care about and love, news that someone got an abortion could be upsetting to anyone. Correct? That's true. But upsetting, something that disappoints you or makes you upset, even makes you cry, does not rise to the level of extreme or outrageous conduct, would you agree? From a reasonable person's standard, not the subjective position of your clients. Everyone seems to take the position that what happened here is kind of like shrug your shoulders, oh, well, stuff happens, maybe they should have been informed, no big deal, we're sorry. But these plaintiffs are asking the court to cringe at what happened here and not just shrug off the fact that the process, which they thought they were illegally entitled to, to weigh in to their daughter's medical care, was totally sidestepped. That's what this complaint is about. Abortion has been legal in the United States for decades, since Roe versus Wade, correct? Yes, Your Honor. And I'm sure you did as well. I searched, did a national search for a case even similar to this case and couldn't find none. Did you do the same?     I have not uncovered a case in which the conduct at issue, that being withholding information from the parents, was either not directed at the plaintiff or not committed within the plaintiff's presence. There isn't even a case regarding that. Forget about going so specific. But have you found a case doing any type of search where there was, you know, there was a case in which the plaintiff, the issue was not directed at the plaintiff's and it was not within the plaintiff's presence and there was liability or there were damages found? If I could have found one, I certainly would have cited one. Without any additional questions, I did want to comment about the Mental Health Act versus the voluntary disclosure. I think in the case of a disabled adult, the sanctity of therapist-patient communications has to be weighed against the fact that the patient has labeled guardians. So I don't know if that privilege is as sacrosanct as my opposing counsel's. Under the Mental Health and Developmental Disabilities Confidentiality Act, in order to be entitled to information in private counseling sessions, your client would have had to sign a consent form, wouldn't she? I'm seeing Kylie would have been required to sign some form of consent to share those private sessions, wouldn't she? I don't know what the arrangement was. I don't know. Theoretically? Under the Act. Under the Act. Not some theoretical application. Yes. Under the Act, did that happen here? We don't know. There's no allegation of any consent forms being signed. But absent a consent form from Kylie, would the therapist even be entitled to share that communication with her parents? The complaint alleges that Alliance undertook a duty to disclose information to the parents based on that quoted language in the complaint. That's where the obligation arose. And it's based on that language that I've made the argument. Thank you. We thank both parties for their arguments today. A written decision will be issued in due course. The Court stands adjourned subject to call.